Our next case is number 2010-1516 JTEKT Corporation v. United States. Ms. McDonald, whenever you're ready. Just hold on one moment until they get settled over here. Okay, you can proceed. May it please the Court. My name is Diane McDonald. I'm of Baker & McKenzie, and I'm representing the NTN Companies today. This Court should remand this case because, one, there is no question that the United States will eliminate the use of zeroing in administrative reviews, and two, this Court's recent decision in Dongbu Steel Company v. U.S. controls this case. Did you make the same argument that the Court cited as a unique argument in Dongbu? We raised the issue, yes, and we raised it clearly enough that the respondent thought we did and responded to it. Well, you raised the issue of zeroing, that's true, but did you make the argument that was made in Dongbu that there was an administrative law problem because of inconsistency in the two types of reviews? Well, we noted that the U.S. had changed its position in response to the WTO case for investigations, and it had not yet changed its position in administrative reviews. Right, and that argument was precisely the argument that was raised in the SKF case in January that this Court rejected, right? Right. This case, we believe, is controlled again by Dongbu because in SKF, the December zeroing decision had not been issued yet, the proposal, and second of all, the issue in SKF was whether it's reasonable to interpret the statute to say that zeroing may be used in administrative reviews. In Dongbu, the question was the different interpretations of the statute in different aspects of the proceeding. Additionally, in SKF, the Court did not consider the December proposal to eliminate zeroing. I think the case was argued and briefed prior to that issuance. The decision came out slightly, something like two weeks after the December proposal, but the Court made no mention of it, and in fact it says the WTO decisions had not been implemented yet. So we believe the Court did not take that into account. Four years ago in February 2007, the United States pledged to interpret, implement the decision of the WTO that zeroing in administrative reviews is contrary to the U.S. obligations. The decision to eliminate zeroing, therefore, was long ago made by the executive branch of government, and Tian is not aware of any statements to the contrary since that decision in 2007. Additionally, as I mentioned in December 2010, the Commerce Department published its long-awaited proposed rule to eliminate zeroing in administrative reviews. The notice specifically states that . . . I'm not clear what the point is here. I mean, we know what Dongbu held. The question is whether that form of relief is available to you in this case. But apart from Dongbu and the inconsistency argument, how is this case different from SKF on the zeroing issue? That the U.S. has made statements to the WTO about U.S. law and how the December proposal will be implemented under U.S. law that differ . . . I mean, how could statements to an international organization require us to reach a different result in interpreting the statute? It's a statement about a section of U.S. law that is raised in the December proposal. And, the U.S. has stated in different fora that that is not the only methodology for implementing the methodology that's noted in the December proposal. So, there are a number of statements by the U.S. that say one thing and they do discuss U.S. law. However, the Justice Department has not recognized those in this case. So, we believe that they should provide an explanation of why their position is different than the U.S., the government it represents. Okay. So, maybe you should address the model matching issues. Model match issue? Okay. The particular . . . well, there are two issues related to model match in this case. One is the model match methodology that Commerce used that was changed in the 15th review. As you probably are aware, this is the 18th review of this case. In changing it, Commerce has made a statement that the new methodology is more accurate than the old family methodology. And, we believe that there's been no evidence or showing of support for this statement. It's simply a statement of accuracy. And, just by stating it's more accurate, it just does not mean that it's so, because the criteria used in the new model matching methodology is looser than under the old one. So, by definition, any of the matches that result from the new criteria must be less accurate than under the old one. In the old . . . But, you don't present any evidence showing of such inaccuracies, do you? I mean, you simply just say the burden should be on the government to prove with evidence the claim that it's making. Well, I think the evidence is in the methodology itself, because, naturally, if you are required to match eight characteristics exactly, then anything, any match that's based on less than those eight characteristics, such as the four used in the new methodology, will be, by definition, less accurate. So, there is no . . . The evidence is in the methodology itself and the logic behind the methodology. We contend that even if the original methodology was an average, I guess, of the family members that matched those eight criteria, Commerce says that just because we can pick one model from the new methodology, picking one model is more accurate than the average of the eight. But that, again, based on the logic of the methodology, can't be so, because if you're averaging eight very, very specific matches, that is naturally going to be more accurate than one, which may not match . . . And there is case law that we are bound by that says that it's not unreasonable. Well, Commerce made the statement that it is more accurate. I mean, that was not . . . that's not . . . they didn't have to make that statement. They could have said it was more reasonable or it is reasonable interpretation, but their basis for changing was that it's more accurate than the family methodology that was used for 14 years in this case. That's the same statement and the same assertion that prior panels of this Court have assessed and found reasonable. Well, the other decisions of this Court, which we have noted, state that there were compelling reasons for the change, which is the reason Commerce gave as well. So, the decisions were based on whether the compelling reasons existed, and the Court said the compelling reasons did exist because there were technological improvements and because if there is one bearing chosen out of . . . instead of a family, that satisfies the statute of more price-to-price comparisons. But, there's no indication anywhere that price-to-price comparisons are more accurate, and Commerce stated that it was so. So, we believe this is a different basis than the other decisions on this. I don't understand that last part. I mean, same eight factors last time, 15th Administrative Review, prior SKF decision, same methodology, and our Court endorsed it as acceptable and within Commerce's discretion and adequately supported. Nothing has changed. Just Commerce threw in the word, oh, yes, and it's also more accurate. Well, that's . . . we already said it was okay for them to do it that way. So, why should the fact that they said, yes, and it's also more accurate, suddenly make it not okay? Well, because the reasons that Commerce gave were that they . . . But, they didn't argue more accurate last time. They argued all the other reasons, and we said those reasons were adequate. So, why don't those same reasons make it equally adequate here, regardless of whether it is or isn't more accurate? Well, because we believe, again, one of the reasons Commerce specifically stated for the change is that this is going to produce more accurate matches. And, again, there's a statute at the basis of this. There is a preference for identical and then similar. Similar matches are based on the physical characteristics. But, when you're matching fewer than eight physical characteristics, it is, by definition, less accurate. So, again, the reason . . . one of the basic reasons that Commerce made the change, we believe, has not been heard by the court or decided under SKF or the other COYO case. There's another aspect to the model match methodology, which results in . . . which is about the tiebreaker methodology used when there are ties. So, if four of the characteristics are matched and the remaining set of models is a group of models from which Commerce has to choose the single most accurate one, Commerce breaks the tie by first looking to the level of trade and by second looking at the time of sale. Third, if none of those produce yet a single most similar model, Commerce goes to the DIFMR adjustment, which is related to the physical characteristics of the product. We believe, however, that Commerce should revert to its original methodology and choose the DIFMR first because the DIFMR is, again, related to the physical characteristics of the product rather than the characteristics of the sale itself. The government argues that the DIFMR consideration, or at least a large portion of the DIFMR consideration, is already taken into account before they get to the tiebreaker. How do you respond to that? It is. It is used in determining whether the pool of matches is going . . . determining the boundary of the pool of matches. So, if it does not meet the DIFMR, then it's thrown out of the pool. But Commerce then uses DIFMR, then it goes to level of trade, time of sale, and then DIFMR again. So, it's elevating the other two characteristics of the sale, which have nothing to do with the characteristics of the product being sold or matched, above, again, the use of the DIFMR. Yes, the DIFMR is used once. We're suggesting that it should be used a second time to determine the single most similar match rather than relegating it to the bottom and below the time of the sale or the contemporaneity. So, at what point do you believe that the statutory factors of volume of trade and timing of the sale come into consideration? They come into consideration once the single most similar product is chosen. Because you can't choose the single most similar product among different sales until you've chosen the product that you're looking at. I mean, you can't look at a range of sales until you know which product sales you're examining. So, they do come into play. The statute does require that the sales are matched, hopefully at the same level of trade. If not, at a second level of trade with an adjustment or within the Commerce Department's contemporaneous month calculation, which is two months back and three months forward. So, the Court of International Trade has twice addressed this, hasn't it? Well, we believe, as we stated in our briefs, that the first case was there's a faulty basis for the case. The argument there was that by using DIFMR we're going to narrow the field. But there is no narrowing of the field at all. It's simply the field is set. Now, how do you choose the most accurate bearing out of that field? So, I'm not sure what the logic was behind the argument. But in the case, it says that was the basis, and we don't believe that's correct at all. It's not an understanding. It's not the correct understanding of the methodology. So, we suggest that that case perhaps was based on faulty logic. Again, we say that the foreign-like product must be determined first before you can determine the time of sale or the level of trade at which it was sold. And I'll reserve the rest of my time. Okay. Thank you. Mr. Preheim, is that correct? Good morning, and may it please the Court. Respectfully, this Court, with respect to the issue of zeroing, is bound by the Court's SKF decision from January of this year. We're also bound by Dongbu, aren't we? Respectfully, Dongbu does not apply to this case. It's SKF that applies, and there are a couple of reasons for that. First, here NTN concedes that Commerce may use zeroing in administrative reviews. Rather, it is simply raising the zeroing issue, as it states, so as not to waive any of its rights related to these entries in the event that the WTO dispute process concludes in a favorable manner. Wait a minute. Page 31 of the blue brief, the header is Commerce should cease to use its statistically biased practice of zeroing. That's the header. Then next page, it points to, in fact, conducting anti-dumping investigations, U.S. has already abolished the practice of zeroing. And then it goes on to say it should do likewise for administrative reviews. So why isn't that adequate to raise this issue very much identical to Dongbu? I've read the Dongbu briefs, and I don't see anything more than those statements in Dongbu. Well, respectfully, the argument that NTN is making is that the court should remand this case to Commerce to allow Commerce to decide how to implement the WTO decisions. That issue has been addressed repeatedly by this court. Well, they're raising a problem with the zeroing in administrative reviews, and they're pointing out that you should stop zeroing in administrative reviews. And as part of that process, they're pointing out the fact that you don't zero in investigations. And that's true. But, again, the argument that NTN is making, NTN then says, and we are not saying that Commerce cannot zero in administrative reviews. We are saying that Commerce has announced a proposal, and the court should remand to allow that process to play out. Well, let's suppose we conclude that either they properly raised the issue or that the failure to raise it is excusable because of a change in the law. Let's assume that. Is there any difference between this case and Dongbu under that assumption? Absolutely. And, again, SKF is the case that this court is bound by. What's the difference? Well, if you look at SKF, there are a couple of differences. First, SKF addressed the very issue. No, but Dongbu. Dongbu in this case. Well, and, again, Dongbu. If they properly raised the issue or didn't waive it, why should this case be different than Dongbu? Dongbu is a very unique case. In Dongbu, because of the factual history before the agency, Commerce did not address zeroing at all in its issues and decision memorandum. There was no mention of zeroing whatsoever. The holding in Dongbu was, because of that fact, the court remanded to the agency to address zeroing, to address the arguments that were made. Commerce somehow, in this case, addressed zeroing and found that there was a reasonable basis to use a different methodology in the two different stages. And yet the portions of the opinion to which you cite don't do that at all. They don't go through any reasoned analysis. They just say, you know, one is white and the other is black, and that's the end of the inquiry. Well, we respectfully disagree. And, again, going to the Dongbu issue. Well, the opinion is on page J173, so if you want to, it would be useful for us for you to point to exactly what you think supports your disagreement with Judge O'Malley's characterization. On page 173, it's the first full paragraph from the bottom that begins, we disagree with SKF's argument, and then it's the next paragraph as well. And to summarize, what Commerce is saying there, and this is, again, the difference between our case and Dongbu, is that Commerce is saying there are significant differences between investigations and administrative reviews. But they don't explain why they would justify zeroing. Like, for example, suppose I were to say, well, gosh, who's a better advocate, the appellee or the appellant in this case? And someone were to ask me that. And I say, well, the appellee's blonde, and the appellant is brunette, and the appellee's a woman, and the appellant is a man. That doesn't actually shed any light at all on who's a better advocate. Now, why isn't this – maybe this does, but not to me, because there's no language in this that explains that because of this particular sighted difference between administrative reviews and investigations, zeroing is more appropriate in one and not the other. And that's the critical link that's missing. This paragraph just articulates random differences without explaining or tying them to the development of zeroing practice being justified. And what Commerce is saying here is that there are different purposes in investigations and administrative reviews. In an investigation, Commerce is – you're trying to determine whether to put an anti-dumping order in place. It's a broad overview of whether, in general, merchandise is being sold or likely to be sold at less than fair value. In an administrative review, there are – So why would zeroing be more or less appropriate? And I'd like to – if I can continue. What that purpose means is that when Commerce is doing a comparison, a comparison between normal value and export price in an investigation, Commerce normally does what's called an average-to-average comparison, and Commerce does not do zeroing in that type of comparison. Now, in an investigation, Commerce can also do what's called an average-to-transaction comparison. Again, we're just talking about investigations right now. And if you look at the U.S. Steel case, Commerce noted, well, if we do an average-to-transaction comparison, we are still going to use zeroing, even within an investigation. So even in an investigation, you have different types of comparisons that can be made. The normal comparison, Commerce is not doing zeroing.  Why? Because the type of comparison where Commerce is doing zeroing is a comparison that's designed under the statute. It's designed to get at what is called mask dumping. And as this Court has noted in the U.S. Steel case, one of the reasons for zeroing is to get at mask dumping. And that comparison in investigations is an average-to-transaction comparison. That is the exact type of comparison that Commerce normally does in administrative reviews, an average-to-transaction comparison. If I understand correctly, is that if on the Dongbu remand, Commerce said exactly what's in these two paragraphs, we should say, well, that's fine. There's the explanation. Commerce wins. Yes, and I would go further than that, Your Honor. I would say that under SKF, to quote from SKF, and this is a decision from January of this year, the only way one can reconcile Dongbu with the SKF decision from a few months ago is the fact that in Dongbu there was no mention at all of zeroing in the issue in the decision memo. To look at SKF, this Court said, even after Commerce changed its policy with respect to original investigations, we have held that Commerce's application of zeroing to administrative reviews is not inconsistent with the statute. And then this Court upheld Commerce's decision to use zeroing in administrative reviews. So respectfully, this Court is bound by SKF on that issue. So you're saying that we should disregard Dongbu as improper precedent. What I'm saying is the only way one can reconcile Dongbu with SKF is given unique facts of Dongbu where there was no mention at all in Commerce's issue in decision memo of zeroing. And the holding of Dongbu is because there was no mention of it, the Court remanded to Commerce. So then under your logic, anytime there's a mention of it, even if it's absurd, which I'm not saying this is, but even if it's absurd, the mere mention is... No, no, that's not what we're saying. This is certainly a reasonable explanation. What we're saying is under SKF, though, this Court is bound to affirm... Did you offer this explanation in Dongbu on the appeal? Do you mean did...the agency had not offered that explanation. Certainly, there were arguments that were made by counsel, but the fact remained that there was... the fact remained there was nothing in the issue in decision memo on that issue, and so the Court remanded. And that's the holding of Dongbu. What is... counsel talks about the government's burden to actually justify the broad statements that they make in support of their argument that any position they take or any process they use is reasonable. So what kind of burden should we impose on these kinds of discussions? Should we simply say, as long as you say we've thought about it and we see a difference, that's enough? Well, obviously, it has to be...the explanation has to be reasonable, and this is certainly a reasonable explanation. It's an explanation based upon the differences between investigations and administrative reviews and the type of comparisons that one is making. That's a reasonable explanation under the standard of review, setting aside SKF, of course. Under the standard of review, the Court should affirm. See, maybe it would be if commerce, to be quite frank, you were more articulate in explaining why there might be justifications between administrative reviews and investigations and a different practice with regard to zeroing than this is. And as much as I credit you for your advocacy, you're not actually commerce, and why should we vacate and remand for them to link it, to link these differences to zeroing in a rational, reasonable way so that we can understand from the agency's perspective that it does exist a reason for it? Well, I think certainly if one looks at this explanation, we believe it certainly provides enough information to meet that standard. One can also look at the U.S. Steel case as well, where this Court discussed a very similar issue in the context of investigations. But respectfully, again, commerce again pointed out the differences between the two and noted that it makes different types of comparisons in administrative reviews as compared to investigations. Any further points that I've made I think are certainly reasonably discernible from the language that's used in the issues and decision. Of course, this Court has held in the past that if commerce's decisional path is reasonably discernible, that that's sufficient under the standard of review. Turning briefly to the issue of model match, with respect to NTN's direct challenge to model match, binding precedent of this Court precludes that challenge. This Court's already rejected the argument that model match is not more accurate than the family method in the STF case. We haven't so addressed the tiebreaker issue. So why would you go to level of trade and timing before you made a determination about the similarity of the product? Why do you go there? Well, certainly commerce already does. I think that's a misunderstanding that NTN has. Commerce, before it even gets to the tiebreaker, has already determined that these models are identical matches for four characteristics, are within 40 percent of the sum of the deviation for another four characteristics, and, and, and this is significant, and are less than or equal to 20 percent in terms of the DIFMA or the cost. So they've gone so far. They have. So commerce has, NTN fails to understand that. If that was the end of the inquiry, you wouldn't need a tiebreaker. Well, no, but sometimes you have models that meet all of that, more than one model that meet all of those criteria. But price considerations have already been, been considered before one even gets to the tiebreaker. The DIFMA is already considered. If a model is not less than or equal to 20 percent in terms of DIFMA, it's kicked out. It's not in the tiebreaker. It's not fully considered. It's only considered up to that point. Well, and again, remember, we're just trying to get to similar merchandise, not identical merchandise. So it is, it is considered, and there's nothing in the statute that precludes commerce from considering level of trade and whether the sales are contemporaneous. In fact, as we noted, there are other parts of the statute where Congress has indicated that those are considerations that have to be, have to be made. Considerations for other things. Yes, that's true. And so what my question is, how do those factors relate to similarity of product? Why wouldn't you just use DIFMA and not even use those factors until the other points in time where they come into play? Well, and again, I think NTN obviously has a different approach, but the question is, is commerce's approach a reasonable one? What's the explanation for it? Well, and the explanation is that, again, all of these sales are already considered similar under the model match methodology. They've already met the statutory definition of similar merchandise before we even get to the tiebreaker. So commerce has. So it doesn't matter if the tiebreaker is really intended to be a tiebreaker? Well, it's obviously intended to be a tiebreaker, but the point is that all of these sales are similar. We've already met the model match methodology. Commerce has met the statutory requirement for identifying similar merchandise. Okay. Anything else? We respect the request of the Court of Firm and the Court of International Trade's decision. Thank you. Mr. DePrest. Good morning, Your Honor. If it pleases the Court, I would like to give a bit additional answer to Judge Moore's question about the explanations that were given by the Commerce Department about the differences between reviews and investigations and why that is relevant to the question that is before the Court on the justification for zeroing. And one thing that I would like to say there is that, I mean, maybe the explanation is inartful, but I think it does a good job of saying that administrative reviews are about assessment of duties. And if you go back to the Timken decision of 2004, it talks about that, too. And it says that when you do an administrative review, you do it to assess duties. And according to the statute, you're supposed to do that entry by entry. And the zeroing process reflects that. It reflects the fact that you would look at an entry, and you would say, okay, on this entry, the normal value is X, and the export price or U.S. price is this, and there is dumping or there is not dumping. And when there is dumping, you would assess a duty. And when there is not dumping, you would not assess a duty because it's not dumping. And in the review that is done now, which is not really entry by entry anymore because they use computers and averages and so forth, they mimic that process. And so that's what the Court recognized in 2004. This zeroing process reflects the fact that you have entry by entry assessment. And it gets some other reasons as well. With due respect, Counsel, you went way beyond what Commerce explained. No. Once again, your explanation may be great, but that's not Commerce's explanation. Well, it does. It does. It says on the bottom of page 173 of the appendix, the purpose of the dumping margin calculation varies significantly between reviews and investigations. Then skip down to the bottom. In reviews, in contrast, the dumping margin is the basis for the assessment of duties on entries. And then they refer to the Act. Now, of course, they don't make reference to the Timken decision and they don't make the legal argument, but they do make the point that it is about assessment. And I think that's important. We can't have a different result on zeroing. We can't have a different result on zeroing in this case than in Dongbu, right? I mean, as far as the facts are concerned, they're the same, same issue. Well, I'm hoping that in Dongbu you will not have a different result. I mean, all you said in Dongbu was that you'd risk an explanation. So why shouldn't we send it back so that the two cases will be considered together and they can come up with whatever explanation they want to and we'll decide whether it's adequate or not. Well, in Dongbu you had no explanation whatsoever. Here I think you have, and you did in SKF too, I think the explanation here is better than the explanation in the SKF case on the previous review. But you do have an explanation, and I think the path is discernible in what, you know, if you put it together with your opinion in 2000, your Timken opinion in 2004, then you have a discernible path, I believe. All right. Thank you, Mr. McGrath. Thank you. First, I would like to say that regarding the tiebreaker methodology, the government's argument is that because all tiebreaker methodologies may yield a different result, anyone will do, and that's what they made in their brief. And I didn't hear them to say anything else but to say that, of course, our methodology yields a different result, but there is no explanation for why their methodology is reasonable. Second, Dongbu is not an unusual case. Dongbu is exactly what happened here, and it's probably exactly what has occurred in every case since the U.S. changed its policy and investigations in 2007, as this Court probably well knows because there have been many of those cases. The difference the government discussed related to the calculation of margins in investigations and reviews is irrelevant here. In fact, when the zeroing methodology is done... But is not the government correct that there was no explanation in Dongbu and that there is some explanation here? Whether or not it's satisfactory is another question, but that there is that difference, is there not? Well, right, it is a very, very basic explanation, and in not satisfactory, I think the government has always said that it's simply that they responded to their international obligations. And additionally, in Dongbu, the argument that there was a difference was made and rejected. In fact, the Court in Dongbu said, this Court has expressly adopted the position taken by the government in earlier cases that there is no statutory basis for interpreting 19 U.S.C. 1677-35 differently in investigations than in administrative reviews. So that question came up in Dongbu, and the Court rejected it. Well, if the Court had rejected it, they wouldn't have vacated and remanded to give commerce an opportunity to try and demonstrate whether there exists a difference. The Court said at this point, unless commerce provides the explanation, it's not reasonable. Okay, so the government's theory is they provided the explanation here, even though they didn't in Dongbu. Well, it's still not a reasonable explanation because the zeroing methodology is exactly the same. All it does is when the calculations have gone through commerce's complicated programs, and there are some differences between investigations and reviews in certain aspects, but after pages and pages and pages of the program, commerce sums up each individual margin transaction, and then when it goes to take a weighted average, it simply ignores the negative margins, same in investigations as in reviews. So that aspect, that very... It doesn't ignore them. It makes them zero. It's... It's not ignoring them. The denominator is going to be the same because they're taking them into account. They're just saying they're zero. So they are counted. They're not ignored. Well, I believe... Maybe my math is wrong. No, they are counted in the denominator, but I believe in the WTO case there was very specific testimony on this. It is quite commonly said that they are set to zero, but there's no actual setting to zero. They just do not add them up. So it comes out to the same, but they just do not add them in their weighted average margin calculation. So that particular part of the program, the very, very slim part of the program, zeroing is one line in Commerce's pages and pages and pages of program. It's one line. That aspect is the same in reviews or in investigations. So in summary... All right. I think, Ms. McDonald, your time is up. Thank you. Okay. Thank you. We thank both counsel. The case is submitted, and that concludes our session for today.